JMG:USAO 2013R00374

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

2014 JUN 18 P 3: 42

CLERK'S OFFICE
AT BALTIMORE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO.   14-0298 |
| v. | * | BY_____ DEPUTY |
| | * | (Health Care Fraud, 18 U.S.C. § 1347; |
| TIMOTHY EMEIGH, | * | Aiding and Abetting, 18 U.S.C. § 2; |
| | * | Forfeiture, 18 U.S.C. § 982, 21 U.S.C. |
| Defendant | * | § 853) |
| | * | |

*******

## INFORMATION

The United States Attorney for the District of Maryland charges that:

### Introduction

At all times relevant to this Information:

**A.**     <u>The Defendant and 'Alpha Diagnostics Services, LLC'</u>

1.     **TIMOTHY EMEIGH,** age 50, was a resident of York Springs, Pennsylvania. **EMEIGH** was a licensed radiographer ("x-ray technologist") in Maryland.   **EMEIGH** was never a physician.

2.     Alpha Diagnostics Services, LLC was principally a portable x-ray supplier in Maryland, Delaware, Pennsylvania and Virginia.   Alpha Diagnostics Services, LLC also supplied/provided portable ultrasound tests, electrocardiograms ("EKGs"), echocardiograms, and Holter monitors.

3.     Alpha Diagnostics was headquartered in Owings Mills, Maryland with an office also located in Harrisburg, Pennsylvania.

5.     **EMEIGH** began working at Alpha Diagnostics in 1993.   Initially **EMEIGH** worked as an x-ray technologist.   In 1997, **EMEIGH** was named Vice President of Operations.

**B.**    **Medicare**

5.    Medicare was a health care benefit program under 18 U.S.C. § 24(b); that is, a public or private plan or contract, affecting commerce, under which medical benefits, items and services were provided to individuals.    Typically, Medicare provided insurance coverage to people age 65 or older and people under age 65 with certain disabilities.

6.    The Centers for Medicare & Medicaid Services ("CMS") was a federal agency within the United States Department of Health and Human Services and was responsible for administering the Medicare and Medicaid programs.   CMS had the authority to make coverage and medical necessity determinations.

**C.**    **Medicare Requirements**

7.    Medicare required, among other items, that providers of portable medical services make and preserve i) a record of the services provided; ii) a description of the procedures; iii) the name of the referring physician; iv) the operator of the portable equipment; and v) the name of the interpreting physician to whom the test was sent.

8.    In order to pay for portable services, Medicare required, among other obligations, that the x-ray or other test i) was ordered by a licensed physician; ii) met appropriate medical necessity; iii) was interpreted by a licensed physician who rendered a formal report; and iv) that accurate and appropriate diagnoses and procedures, and corresponding codes, were enumerated on a Medicare payment claim form.

**D.**    **The Scheme and Artifice to Defraud**

9.    Beginning at least in 1997 and continuing through October 2013, **EMEIGH** did willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, that is, Medicare, and to obtain, by means of false and fraudulent pretenses,

2

representations and promises, money and property owned by and under the custody and control of Medicare, in connection with the delivery and payment for health care benefits, items and services; to wit, by creating false radiology, ultrasound and cardiologic reports, by submitting insurance claims for radiology, ultrasound and cardiologic examination interpretations that were never completed by licensed physicians, and by falsely representing to Medicare, as well as to ordering physicians, that the interpretations had in fact been completed by actual licensed physicians, as set forth more fully below.

10.     It was part of the scheme and artifice to defraud that **EMEIGH** began performing intermittent x-ray interpretations in lieu of a licensed physician/radiologist in 1997.

11.     It was further part of the scheme to defraud that **EMEIGH** typed the body of the "physician's" interpretation report using the style of the listed physician, which was assigned to him by a complicit co-worker.

12.     It was further part of the scheme to defraud that, in 2003, **EMEIGH** began interpreting medical tests and writing reports in the names of registered licensed physicians, from his home while using his home computer or mobile telephone.

13.     It was further part of the scheme to defraud that **EMEIGH** created false interpretation reports when he was travelling out-of-state and even, at times, overseas.

14.     It was further part of the scheme to defraud that, **EMEIGH** also interpreted examinations and drafted false reports for ultrasounds and EKGs.

15.     It was further part of the scheme to defraud that, by 2010, **EMEIGH** performed more than 70% of the x-ray interpretations of Alpha Diagnostics, which included more than 1,000 interpretations each month for Maryland patients alone.

16.     It was further part of the scheme to defraud that, if a patient caregiver contacted

3

Alpha Diagnostics to question the medical interpretation reports generated by **EMEIGH** or other unlicensed Alpha Diagnostics personnel, **EMEIGH** and a co-schemer reassigned the diagnostic interpretation to an actual licensed physician for a second interpretation, who was not apprised of the first interpretation and conclusion.

17. It was further part of the scheme to defraud that Alpha Diagnostics routinely submitted insurance payment claims to Medicare within which Alpha Diagnostics exaggerated the number of anatomical views performed by its x-ray and ultrasound technologists.

18. It was further part of the scheme to defraud that Alpha Diagnostics routinely submitted insurance payment claims for multiple transportation charges on occasions when multiple patients had been examined at the same facility/location.

19. It was further part of the scheme to defraud that, Alpha Diagnostics routinely billed Medicare for "global" x-ray procedures (i.e., both professional and technical components), along with transportation and setup charges, for studies interpreted "in-house" by **EMEIGH** or other unlicensed Alpha Diagnostics personnel.

### The Charge

20. Beginning at least in 1997 and continuing through in or about October 2013, in the District of Maryland and elsewhere, the defendant,

### TIMOTHY EMEIGH,

did knowingly and willfully execute and attempt to execute the scheme and artifice to defraud Medicare, and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items and services; to wit, by creating false radiology, ultrasound and cardiologic reports; by submitting insurance claims

4

for radiology, ultrasound and cardiologic examination interpretations that were never completed by licensed physicians; and by falsely representing to Medicare, as well as to ordering physicians, that said interpretations had in fact been completed by actual licensed physicians.

18 U.S.C. § 1347
18 U.S.C. § 2

## FORFEITURE ALLEGATIONS

The United States Attorney for the District of Maryland further charges that:

1.    As a result of the offense alleged in this Information, the defendant,

### TIMOTHY EMEIGH,

shall forfeit to the United States any and all property, real and personal constituting or derived, directly or indirectly, from gross proceeds traceable to the commission of the offenses, including, but not limited to:   approximately $700,000.00.

2.    If, as a result of any act or omission of **TIMOTHY EMEIGH**, any such property subject to forfeiture:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third person;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

18 U.S.C. §§ 982(a)(7), 982(b)(1)
21 U.S.C. § 853

*Rod J. Rosenstein by nwc*

Rod J. Rosenstein
United States Attorney, District of Maryland

6